SIXTH DIVISION  

JANUARY 29, 1999

Nos. 1-97-3538 and 1-97-3539 (Consolidated)

CITY OF CHICAGO, ) APPEAL FROM THE

a municipal corporation, ) CIRCUIT COURT

) OF COOK COUNTY.

Plaintiff-Appellant/ )

Cross-Appellee, )

)

v. ) No. 95 CH 8461

)

WATER PIPE EXTENSION, BUREAU OF )

ENGINEERING LABORERS' LOCAL NO. 1092, )

) HONORABLE

Defendant-Appellee/ ) AARON JAFFE,

Cross-Appellant. ) JUDGE PRESIDING.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiff City of Chicago (City) appeals an order of the circuit court of Cook County denying its petition to vacate part of an arbitration award rendered in a labor arbitration between the City and defendant Water Pipe Extension, Bureau of Engineer­

ing Laborers' Local No. 1092 (Union, Local 1092).  Defendant cross-appeals the trial court's order denying the Union's peti­

tion to vacate a different part of the same arbitration award that was decided in favor of the City.

The record on appeal indicates the following facts.  The City is an Illinois municipal corporation and a "public employer" within the meaning of the Illinois Public Labor Relations Act (Act) (5 ILCS 315/3(o) (West 1994)).  Local 1092 is a "labor organization" within the meaning of the Act (5 ILCS 315/3(i) (West 1994)).  

The City and the Union are parties to a collective bargain­

ing agreement (CBA), which became effective January 1, 1992.  This case primarily involves Article 9 of the CBA, which address­

es "Hours of Work and Overtime."  Section 9.1 of the CBA states the purpose of Article 9:

"This Article is intended to define the workweek, establish schedules and serve as the basis for the calculation of overtime.  It shall not be construes as a guarantee of work or hours for any day or week except as ex­pressly provided herein.  Under no circum­

stances shall hours be changed solely to avoid the payment of overtime."

Section 9.3.2 of the CBA, which addresses changes of work shifts and schedules, provides in part that:

"Whenever the City believes it is neces­

sary to temporarily change (a) a scheduled shift assignment or (b) the starting time for such assignment outside the *** normal start­

ing times for shifts the Union shall be given at least ten (10) days notice and shall be ad­vised as to the reason for the changes(s) and the dura­tion thereof.  In an emergency situa­tion the City shall give as much notice as possible.  As soon as the tempo­rary necessity is alleviated normal assignment and scheduling shall be resumed.

* * * * *

The appropriate rate of overtime shall be applicable to all hours worked before or after an employee's regular­ly assigned shift and no starting time or shift sched­ule will be estab­lished or altered for the purpose of avoiding payment of overtime."

Section 9.7.1 of the CBA addresses payment for overtime work.  Generally, all work in excess of 8 hours in a workday is to be paid at 1 ½ times the standard pay rate.  Work in excess of 10 ½ hours in a workday is to be paid at 2 times the standard pay rate.  The first 8 hours of a sixth workday in a workweek is to be paid at 1 ½ times the standard pay rate, and 2 times the standard rate thereafter.  Work performed on a seventh workday in a work week is to be paid at 2 times the standard rate.

Section 9.12 of the CBA addresses "Degree Days," providing in part as follows:

"(a) Locals 1001 and 76.  In accordance with cur­rent practice, in Departments which historically cur­tailed operations due to low temperature and/or other weather factors, the Standard Temperature Station will be the Air­

port determined by the Department.  A depart­

ment will not change the traditional historic factors at which its operators have been curtailed without notice to and consul­tation with the Union.

* * * * *

(b)  This section shall not apply to Local 1092."

On or about February 3 and March 14, 1994, the Union filed grievances against the City, alleging violations of the CBA.  Grievance 1994-3 alleged that on or about January 17, 1994, the City's Water Department temporarily changed shifts for laborers to two 12 hour shifts, failed to notify the Union of the change and paid the employees only the regular pay for the first 8 hours of each shift.  Grievances 1994-5 and 1994-6 alleged that the City's Sewer Department and Water Department, respectively, temporarily changed the shifts of laborers "assigned to snow removal under Phase III, effective February 23, 1994," and these employees were not paid overtime for the shifts worked or regular pay for shifts lost due to the alteration or cancellation of shifts.

On February 1, 1995, the grievances were submitted to arbi­

tration before Edwin H. Benn.  The record shows that between 1989 and 1994, Benn issued 3 awards in arbitrating 14 prior shift change grievances between the parties.  Benn heard the 3 griev­

ances at issue in this case on February 1 and 27, 1995.

The testimony at the hearing establishes that on January 17, 1994, the temperature was between 15 and 20 degrees below zero, with wind chills falling between 50 and 60 degrees below zero.  Joseph Gagliano, the Deputy Commissioner of Operations in the Sewer Department, with responsibility for managing the Mainte­

nance Division handling sewer cleaning and repair, and Deputy Commis­sioner Dennis Connolly decided to shut down operations for January 18, 1994, and to "take one day at a time."

Gagliano telephoned Union Secretary Treasurer Robert LoVerde to inform him that Gagliano was considering knocking off the employees with a "NW" (no work) or vacation day.  Connolly told LoVerde that a facsimile would be sent notifying him of the deci­

sion for January 18 and possibly January 19.  Operations were ultimately cancelled for both days.  Gagliano testified, however, that no one called the Union to inform it of the decision regard­

ing January 19, 1994.

On January 19, 1994, Gagliano received a telephone call from Robert Magnuson of the Water Department, who stated that an exces­sive number of water main breaks caused by the cold weather re­quired the assistance of 30 laborers and 10 hoisting engineers from 8 p.m. to 8 a.m.  Gagliano testified that he telephoned LoVerde to notify the Union of shift changes that would be re­quired to accommodate this need.  In his testimony, LoVerde ini­

tially denied receiving a call from Gagliano on January 19, 1994, but later stated that he did not recall receiving a call from Gagliano, but may have.

On February 23, 1994, between 10 a.m. and 10:30 a.m., Gagli­

ano was notified that "Phase III snow removal" was being activat­

ed.  "Phase III snow removal" is declared when a snowfall is between 7 and 11 inches, and requires the cooperation of a number of City Departments under the direction of the Department of Streets and Sanitation.  The Sewer Department's plan for Phase III involves placing employees on 12 hour shifts.  Daniel Exposi­

to, the Sewer Department's Director of Personnel, sent a fac­

simile to LoVerde at approximately 1:28 p.m., notifying the Union of the shift changes.  LoVerde testified that he had received a telephone call from Exposito inquiring how to properly notify the Union.

Phase III was cancelled on February 24, 1994, with opera­

tions returning to normal that afternoon.  However, on February 25, 1994, the weather worsened, resulting in a severe blizzard.  Connolly was notified by the Department of Streets and Sanitation that Phase III was being activated again.  Connolly and Super­

intendent of Sewer Operations Myles McDarrah, who had assumed Gagliano's snow removal duties on February 24, 1994, testified that they did not notify the Union of the February 25, 1994, reactivation of Phase III snow removal.

The parties submitted briefs to the arbitrator on May 18 and 19, 1995.

On June 7, 1995, the arbitrator issued his opinion and award.  The arbitrator recounted the history of shift change disputes between the parties.  In particular, the arbitrator discussed his prior decision dated December 2, 1992, in which the arbitrator denied the Union's request for double time pay.  The arbitrator then quoted at length from the transcript of proceed­

ings for December 2, 1992, including passages in which the arbi­

trator stated that "the question really now is how to handle future violations," and that to "get the message through" to the people administering the CBA, "[a]ny violations that occur after today where the facts are not debatable *** any remedy will be at the double time rate."

The arbitrator then determined that the Water Department had violated the notice requirement of section 9.3.2 of the CBA.  The arbitrator concluded that the City's reasons for failing to give notice in January and February 1994, "while perhaps understand­

able given the pressure of the circumstances, [were] contractual­

ly insufficient."  Based on his December 2, 1992, decision, the arbitrator concluded that the overtime remedy for all hours worked by Water Department employees on changed shifts outside their normal shifts on the dates at issue was to be paid at a double time rate.

The City had argued before the arbitrator that the double time award was outside the arbitrator's authority.  The arbitra­

tor ruled that he had decided that this would be the remedy for future violations on December 2, 1992, and that the City could not attack that award now, as it had not challenged the award at the time.  The arbitrator agreed with the City's argument that he lacked the authority to impose punitive damages as a remedy, but concluded that his prior decision that future awards could be based on the double time rate was not clearly erroneous, as such relief would restore the balance of power between the parties.

The arbitrator next ruled that the Union had shown that the Sewer Department violated the notice requirement only as to Febru­ary 25, 1994, and imposed a double time remedy.  

The arbitrator also ruled that the Sewer Department did not violate the CBA by cancelling shifts on January 18 and 19, 1994, and February 24, 1994.  The Union's grievance in this regard was based on section 9.12 of the CBA.  The arbitrator noted that while section 9.12(b) of the CBA stated that the "Degree Days" rules did not apply to Local 1092, it did not state what rules did apply to the situations presented on the dates at issue.  Given the lan­guage of section 9.1 that Article 9 should not be construed as a guarantee of work, as well as other provisions of the CBA which required pay for employees unable to work due to weather condi­tions in situations other than those involved in this case, the arbitrator concluded that the City was within its rights under Article 27 of the CBA to cancel the shifts at issue.

On September 1, 1995, the City filed a petition in the trial court to vacate the part of the arbitration award imposing the double time remedy.  The Union filed a petition to vacate the part of the arbitration award denying the Union's section 9.12 claim.  The City moved for summary judgment on January 7, 1997.  The trial court confirmed the arbitration award on August 19, 1997.  Both parties filed timely notices of appeal, which were consolidated for hearing before this court.

I

Initially, we address the standard of review.  Both parties claim that the arbitrator exceeded his authority in deciding different parts of this case.  The parties agree that the ques­

tion of whether the arbitrator exceeded his authority is one of law, subject to 
de novo
 review by this court.  
City of Chicago v. American Federation of State, County and Municipal Employees, Council 31
, 283 Ill. App. 3d 446, 451, 669 N.E.2d 1311, 1314 (1996) (
Chicago v. AFSCME
).

II

The City contends that the arbitrator exceeded his authority by imposing the double time remedy, arguing that it constitutes punitive damages that the arbitrator lacks the authority to award.  Section 8 of the Illinois Public Labor Relations Act requires that the arbitration provisions of a CBA of the sort at issue here shall be subject to "the 'Illinois Uniform Arbitration Act.'"  5 ILCS 315/8 (West 1996).  However, section 12 of the Uniform Arbi­tration Act, as adopted in Illinois, provides in part that the grounds for vacating an arbitration award under a CBA shall be those which existed before Illinois adopted the Uniform Arbitra­tion Act.  710 ILCS 5/12(e) (West 1996).  Accordingly, our supreme court stated in a case arising under the Illinois Public Labor Relations Act that the arbitration award must be enforced if the arbitrator acts within the scope of his authority and his award draws its essence from the CBA.  
American Federation of State, County and Municipal Employees v. State of Illinois
, 124 Ill. 2d 246, 254, 529 N.E.2d 534, 537 (1988).

This court has held that punitive damages may be awarded in arbitration, but only where the parties have expressly agreed to the arbitrators' authority to award punitive damages.  
Edward Electric Co. v. Automation, Inc.
, 229 Ill. App. 3d 89, 105, 593 N.E.2d 833, 843 (1992).  Although 
Edward Electric Co.
 did not involve a public employment CBA, the decision was based on sec­

tion 12(a)(3) of the Uniform Arbitration Act, as adopted in Illinois, which provides that an award shall be vacated where the arbitra­tors have exceeded their powers.  See 
Edward Electric Co.
, 229 Ill. App. 3d at 96, 593 N.E.2d at 837.

In 
Chicago v. AFSCME
, this court held that the rule estab­

lished in 
Edward Electric Co.
 was equally applicable to a public labor arbitration case.  283 Ill. App. 3d at 451, 669 N.E.2d at 1314.  This court reasoned that an arbitrator who exceeds the authority granted him or her by a CBA violates both the Illinois common law and statutory standards.  
Chicago v. AFSCME
, 283 Ill. App. 3d at 451, 669 N.E.2d at 1314.  The 
Chicago v. AFSCME
 court, examining federal case law on the question, also noted that feder­al appellate courts were split on the question of whether punitive damages could be awarded where an employer failed to observe a "meet and discuss" provision of a CBA.  See 283 Ill. App. 3d at 452-54, 669 N.E.2d at 1315-16.  The 
Chicago v. AFSCME
 court fur­ther noted that federal law establishes that National Labor Rela­tions Board orders must be remedial, not punitive.  283 Ill. App. 3d at 454, 669 N.E.2d at 1316.

The arbitrator's opinion in this case stated "that 
absent a provision in a collective bargaining agreement authorizing an arbitrator to do so
, an arbitrator does not have the authority to impose punitive damages as a remedy (emphasis added)."  However, the arbitrator stated that "[i]t must be assumed that [his] deci­

sion of December 2, 1992, did not intend to impose punitive re­

lief, but only intended to fashion a remedy that fell within [his] authority as an arbitrator."  The arbitrator also believed that "[i]t is fundamentally incorrect to analogize the function­ing of an arbitrator in a labor dispute to that of an arbitrator in a commercial setting," as in 
Edward Electric Co.
  Based on the greater latitude afforded labor arbitrators, the arbitrator con­

cluded that his prior decision regarding a double time remedy for future violations was not clearly erroneous.

As the arbitrator correctly stated that he could not award punitive damages, the first question raised by the City's appeal is whether the remedy imposed in this case was punitive.  This question was also raised in 
Chicago v. AFSCME
.  In that case, the union relied on 
Kelsay v. Motorola, Inc.
, 74 Ill. 2d 172, 186, 384 N.E.2d 353, 359 (1978), which suggested that punitive damages are intended to punish the defendant or deter the defendant or others from similar future wrongdoing.  
Chicago v. AFSCME
, 283 Ill. App. 3d at 451, 669 N.E.2d at 1314.  

In this case, the arbitrator and the Union have maintained that such a definition, rooted in tort case law, is incorrect.  However, this approach is not inconsistent with federal case law, which suggests that a labor arbitration award that exceeds the monetary loss suffered by the party injured by the breach of contract is generally considered punitive.  See, 
e.g.
, 
Desert Palace, Inc. v. Local Joint Executive Board of Las Vegas
, 679 F.2d 789, 794 (9th Cir. 1982), 
citing
 
Westinghouse Electric Corp., Aerospace Division v. IBEW Local 1805
, 561 F.2d 521, 523-24 (4th Cir. 1977), 
cert. denied
, 434 U.S. 1036, 54 L. Ed. 2d 783, 98 S. Ct. 771 (1978).

This court has ruled that while not determinative, a deter­

mination of whether an award is punitive generally begins with the plain language of the opinion and award.  
Chicago v. AFSCME
, 283 Ill. App. 3d at 451-52 & n.1, 669 N.E.2d at 1314 & n.1.  In 
Chicago v. AFSCME
, the arbitrator had initially justified an award as a penalty or deterrent for the City's violation of a "meet and discuss" provision of a CBA, but on remand from the trial court stated it was "make whole relief" and not intended to be punitive.  See 
Chicago v. AFSCME
, 283 Ill. App. 3d at 449-50, 669 N.E.2d at 1312-13.  This court concluded that despite the arbitrator's later statement, the award was intended to deter or punish the City.  
Chicago v. AFSCME
, 283 Ill. App. 3d at 452, 669 N.E.2d at 1315.

In this case, the arbitrator commented in December 1992 that the question was "how best to handle future violations," that he saw his function as "getting the message through" to the people administering the CBA on a day-to-day basis, and that a double time remedy would be imposed in the future if there was a "will­

ful violation."  The opinion and award quoted these remarks, then ruled that the violations at issue here were clear, though per­

haps not willful.  In response to the City's argument that the award was punitive, the arbitrator agreed that he could not award puni­tive damages, but that "[t]herefore, it must be assumed that [his] decision of December 2, 1992, did not intend to impose punitive relief ***."  The pattern of making initial comments suggesting an intent to deter the City from violating a notice provision of the CBA, followed by comments stating that the relief was not intended to be punitive after the question was raised, is precisely what occurred in 
Chicago v. AFSCME
.

The Union argues that 
Chicago v. AFSCME
 is distinguishable because the arbitrator there made an excessive award to the union itself, rather than to injured members.  While the fact that the award in 
Chicago v. AFSCME
 was to be made to the union itself was certainly a factor leading this court to conclude that the award was punitive, we do not read the opinion in 
Chicago v. AFSCME
 as making that factor the sole or determinative one.

Beyond the arbitrator's statements, it is undisputed in this case that the double time relief exceeds the amount of overtime pay to which the employees at issue are entitled under the CBA.  The award exceeds the monetary loss suffered by the party injured by the breach of contract, which federal case law would suggest renders at least that portion of the award punitive in nature.  Although an excessive award might be approved under federal law if the excess were deemed manifestly nominal (see 
e.g.
, 
Baltimore Regional Joint Board, Amalgamated Clothing Workers of America v. Webster Clothes, Inc.
, 596 F.2d 95, 98 (4th Cir. 1979)), there is no suggestion in this case that the excess portion of the award is nominal.

The arbitrator's opinion that the double time relief fell within his discretion is based largely on 2 of 3 landmark Supreme Court cases generally known as the "Steelworkers Trilogy."  See 48A Am. Jur. 2d, Labor and Labor Relations § 3352 (1994).  For example, the opinion here quotes the seminal Supreme Court opin­

ion in 
United Steelworkers of America v. Enterprise Wheel and Car Corp.
, 363 U.S. 593, 597, 4 L. Ed. 2d 1424, 1428, 80 S. Ct. 1358, 1361 (1960):

"When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judg­

ment to bear in order to reach a fair solu­

tion of a problem.  This is especially true when it comes to formulating remedies.  There is the need for flexibility in meeting a wide variety of situ­ations.  The draftsmen may never have thought of what specific remedy should be awarded to meet a specific contin­

gency."

However, the arbitrator's opinion omits the remainder of the paragraph:

"
Nevertheless, an arbitrator is confined to interpreta­tion and application of the collec­

tive bar­gaining agreement; he does not sit to dis­pense his own brand of industrial justice
.  He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collec­

tive bar­gaining agreement.  When the arbitra­

tor's words mani­fest an infidelity to this obligation, courts have no choice but to re­

fuse enforcement of the award."  
Enter­prise Wheel and Car Corp.
, 363 U.S. at 597, 4 L. Ed. 2d at 1428, 80 S. Ct. at 1361 (emphasis add­ed).

Courts adopting the rule that a labor arbitrator can award puni­

tive damages only where the parties have expressly agreed to them have rejected the argument that cases such as 
Enterprise Wheel and Car Corp.
 authorize the arbitrator to award punitive damages.  See, 
e.g.
, 
Baltimore Regional Joint Board,
, 596 F.2d at 98.  These courts hold that absent an agreement, an award of punitive damages does not draw its essence from the CBA.  See, 
e.g.
, 
Island Creek Coal Co. v. District 28, United Mine Workers of America
, 29 F.3d 126, 131-32 (4th Cir. 1994).  To hold otherwise would overturn the rule requiring agreement for the imposition of such damages.

The arbitrator's opinion in this case also cites 
United Steelworkers of America v. Warrior & Gulf Navigation Co.
, 363 U.S. 574, 578, 581, 4 L. Ed. 2d 1409, 1415, 1417, 80 S. Ct. 1347, 1351, 1352 (1960), for the propositions that a labor arbitration differs from a commercial arbitration and that the labor arbitra­

tor's source of law is not confined to the express provisions of the contract.  However, the arbitrator's opinion again omits the remainder of the Supreme Court's discussion, which explains that these rules are based on the idea that "the industrial common law -- the practices of the industry and the shop -- is equally a part of the collective bargaining agreement although not ex

pressed in it."  
Warrior & Gulf Navigation Co.
, 363 U.S. at 581-

82, 4 L. Ed. 2d at 1417, 80 S. Ct. at 1352.  In this case, there is no indica­tion in the award or the record that the award was based on the practices of the industry or the shop.

Furthermore, we reject the arbitrator's suggestion that the City could not attack that award because he had decided that this would be the remedy for future violations on December 2, 1992.  The City prevailed in the prior arbitration, and could not be required to appeal the arbitrator's warning, as our judiciary does not sit to issue advisory opinions to parties not yet af­

fected.

In sum, the double time relief awarded in this case was punitive, as the record shows that it was intended to deter or punish the City for a pattern of failing to notify the Union of the shift changes.  The award exceeds the overtime pay to which the Union members at issue were entitled under the CBA on the dates at issue in this case.  The arbitrator exceeded his author­

ity in making the award.  Thus, this portion of the judgment must be reversed.

III

Local 1092 contends that the arbitrator's award finding that the City did not violate section 9.12 of the CBA fails to draw its essence from the agreement.  As noted above, section 9.12(a) of the CBA addresses "Degree Days," providing in part that as to Locals 1001 and 76, a department will not change the traditional historic factors at which its operators have been curtailed due to low temperature or other weather factors without notice to and consultation with the Union.  However, section 9.12(b) states that "[t]his section shall not apply to Local 1092."  

Local 1092 argues that "[o]nly members of Locals 1001 and 76 are subject to Degree Days and are subject to having their work operations shut down based on historic factors such as low tem­

perature and/or other weather factors."  Local 1092 claims that the arbitrator "failed to make any mention of [section] 9.12(b) nor did he explain why that provision was not applicable to the present case."  Local 1092 further claims that the arbitrator relied on sections 9.1, 9.5 and Article 27 of the CBA, but that these provisions of the CBA do not support the arbitrator's deci­

sion.

However, the plain language of section 9.12(a) may be read such that the phrase "historic factors" refers to the criteria used to decide when low temperature or other weather factors permit curtailment of work without notice to and consultation with the Union.  For example, the temperature will be measured at the airport determined by the department.  Thus, the arbitrator could conclude that section 9.12(b) merely means that the his­

toric criteria need not be used to determine when the work of Local 1092 members can be curtailed due to weather conditions.

Moreover, the arbitrator not only mentioned section 9.12(b), but also quoted it in his opinion.  However, assuming 
arguendo
 that section 9.12(b) was ambiguous, the arbitrator noted that section 9.1 provides that Article 9 is not a guarantee of work or hours, except as expressly provided therein.  The arbitrator then noted that when the parties intended that employees be paid for not being able to work due to weather conditions, they did so, citing section 9.5 as an example.  The arbitrator further noted that Article 27 of the CBA gives management the right to cancel shifts.  Given the whole of the CBA, the arbitrator could reason­

ably conclude that the City had the right to cancel shifts with­

out paying Local 1092 employees for the cancelled shifts in this case.  Accordingly, this portion of the award draws its essence from the CBA.

For all of the aforementioned reasons, the judgment of the circuit court of Cook County regarding the double time remedy is reversed and remanded for further proceedings consistent with this opinion.  The judgment of the circuit court of Cook County regard­ing the alleged violation of section 9.12 of the CBA is affirmed.

Affirmed in part, reversed in part and remanded.

BUCKLEY, J., and ZWICK, J., concur.